[Cite as *State v. Jones*, 2018-Ohio-673.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

STATE OF OHIO                                      :
                                                   :
      Plaintiff-Appellee                    :       Appellate Case No. 2016-CA-22
                                                   :
v.                                                 :       Trial Court Case No. 2013-CR-193
                                                   :
ADAM L. JONES                                      :       (Criminal Appeal from
                                                   :        Common Pleas Court)
      Defendant-Appellant                   :
                                                   :

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of February, 2018.

. . . . . . . . . .

JANNA PARKER, Atty. Reg. No. 0075261, Miami County Prosecutor's Office, 201 West Main Street, Troy, Ohio 45373
      Attorney for Plaintiff-Appellee

NIKKI BASZYNSKI, Atty. Reg. No. 0091085, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Adam L. Jones appeals from the trial court's denial of his petition for post-conviction relief following an evidentiary hearing.

{¶ 2} In his sole assignment of error, Jones contends the trial court abused its discretion in denying his petition, which alleged that his trial counsel had provided ineffective assistance by, among other things, failing to retain an expert witness to rebut the prosecution's case at trial.

## I. Procedural and Trial Factual Background

{¶ 3} The record reflects that a jury convicted Jones on one count of child endangering, a second-degree felony. The 2014 conviction stemmed from a head injury sustained by "Marianne,"[1] the four-year-old daughter of Jones' girlfriend, while the child was in his care. On August 5, 2010, the child's mother and Jones put the child down for a nap in an upstairs bedroom of the house where they were living with friends and the friends' children. The mother then left the house, and Jones was the only remaining adult with Marianne and the friends' children. Jones said he then went downstairs and watched the friends' children play a video game. Within about 20 minutes, he said he went back upstairs and found Marianne lying on her side on the floor. He testified that her eyes were rolled back in her head, and she was gurgling. Jones carried the child to a neighbor's house and called for help. A paramedic arrived and transported the child to Upper Valley Medical Center (UVMC). Her mother also responded to the hospital. She testified that at UVMC the child had a large knot on the left side of her forehead and bruising on the left

---

[1] As we did in a prior direct appeal, we will use the fictitious name "Marianne" to protect the child's privacy.

ear, neither of which was there when she left the child at home with the appellant. Marianne's mother testified that the remains of the knot were also visible in State's photo Exhibits 11 and 12, taken several days after the incident, which depict an obvious abrasion on the left forehead. At UVMC, the child was unconscious, had a CAT[2] scan performed, had a ventilator with a breathing tube applied, and then was care-flighted to Cincinnati Children's Hospital.

{¶ 4} In Cincinnati, Dr. Charles Stevenson, a pediatric neurosurgeon, confirmed the existence of a large blood clot, or hematoma, in the subdural space over the left side of the child's brain. Due to the size of the hematoma in the confined skull, pressure had pushed the brain dramatically, about three-quarters of an inch [2 cm], to the right. Dr. Stevenson performed surgery "to remove the [left] side of the skull and take it off as one large piece." (T-2, 15).[3] He saw an active hemorrhage. At trial, he explained:

> [S]o we open up, we widely open up the membrane that's containing the clot. And then at that point in time you can see the clot. It is large, it is red, it's under significant pressure, and once you release it, it normally starts to extrude itself; the brain starts to extrude it out towards you. And so what we very quickly do then is use gentle irrigation and instruments to remove

---

[2] We perceive the more current and common term is "CT" scan, and the UVMC report refers to "CT Head C." But because the transcript generally refers to the test as a "CAT" scan, we often use that term.

[3] The transcripts of the three-day jury trial are designated Day 1, Day 2 and Day 3, but the pages for each volume serially begin at number 1. Consequently, we refer to the jury trial transcript as T-1, T-2 and T-3 and then by page number of that volume. The post-conviction evidentiary hearing transcripts also are designated Day 1, Day 2 and Day 3, and are serially numbered beginning at 1 for each volume, and there is the separate deposition of Dr. Kenneth Monson. We refer to these as T-PCR-1 T-PCR-2, and T-PCR-3 and Monson Depo., and then by page number.

all of this clot off the surface of the brain. And as you do that, you can see the underlying surface of the brain, * * * *

This then continues for several minutes, because you want to be able to remove all of the clot or as much as you safely can, and typically what happens is at some point, when you remove some bit of the clot, you're going to find the underlying blood vessels that are actually responsible for the bleeding, all right, those blood vessels that were injured that started bleeding to cause the hematoma.

And in this case, we definitely found that. There are very large set of veins at the top of all of our brains that run in the center and just off to each side. And she had significant amount of active hemorrhage from these, which I was able to identify as soon as I removed the clot in that region. I then spent several minutes stopping this bleeding.

When asked if this was "fresh blood," Dr. Stevenson stated:

Yes. The vast majority of this blood that was either forming clot in various stages, that was either a few hours old or there were some just liquid blood that was so fresh that it had not yet had time to clot off. Especially near the regions of the veins that she had bleeding, there was just active spurting of blood that was pooling and had not yet clotted off.

Q. Okay. So there's fresh blood that had collected and then still active bleeding-

A. Yes.

(T-2, 16-17).

The only documentary evidence introduced at trial regarding the UVMC CAT scan—two photocopies of CAT scan image slices (State's Exhibits 15 and 16)—had been referred to on direct examination of Dr. Stevenson. Upon cross examination, defense counsel referred to these exhibits as follows:

> Q. Okay and you had indicated that the bright white part is new blood, okay. But that brown, or the darker layer could be several different things, okay. One of the things that you had indicated that it could be old blood. Correct? Okay. If a person suffered a minor subdural hematoma, okay, where there was bleeding, okay, but we didn't remove the blood, okay, and there are those cases, correct?
>
> A. Yes there are.
>
> * * *
>
> Q. Okay. All right. With this, it's possible is it not doctor that the darker images there [Exhibit 15 or 16] reflect that there has been prior bleeding in this brain?
>
> A. *Based purely off the CAT scan images*, that's always a consideration, yes.

(T-2, 32) (Emphasis added). And upon further questioning, Dr. Stevenson reiterated:

> Q. Okay in looking at this CAT scan, is it possible that this could be an acute [new or fresh] on chronic [old]?
>
> A. *Based purely off of the CAT scan*, there is a chance that that could be the case yes.

(T-2, 34). (Emphasis added).

{¶ 5} On re-direct examination, Dr. Stevenson testified that he did not note any indication of a prior subdural hematoma in his report, but if during surgery he had visually observed what he believed to be indication of a prior "minor" subdural hematoma he would have noted it:

> * * * because it would make a difference in terms of what was done procedurally, and what the patient's prognosis would be expected to be.
>
> Q. And there was nothing in – correct me if I'm wrong, there was nothing in your review of the scans from July 25th or the previous nasal injury to suggest that there was any sort of minor subdural hematoma?
>
> A. Not to the best of my knowledge, no.
>
> Q. When you performed this surgery, and you actually had the opportunity to look at this child's brain, is there – was there anything there to you that was suggesting – did you believe this to be an old injury, or did you believe this to be a fresh injury?
>
> A. Well the injury that we were treating emergently was absolutely fresh injury. She had a very large clot, only some of which is actually depicted on these images that we had here. The volume of the clot was quite extensive. The clot itself was new, organizing blood, and she had active bleeding, active hemorrhage out into the operative field, pooling there. So all of that was absolutely new.
>
> Q. Okay. And does a – if a – although you didn't see any evidence of a minor subdural hematoma, does a small subdural hematoma cause a

large, acute subdural hematoma like you saw in [Marianne] when you treated her?

A. No it does not.

Q. So there would have to have been some separate event that caused the acute subdural hematoma that you witnessed?

A. Yes.

(T-2, 44-45). Dr. Stevenson's testimony also included that subdural hematomas almost always are caused by traumatic injuries including, for example, motor-vehicle collisions or falls from a significant height such a second-story window or, possibly, the top of a bunk bed.

{¶ 6} Fortunately, within days of the surgery, the child made a "dramatic recovery" and was able to open her eyes, breathe on her own, and begin talking.

{¶ 7} In Jones' defense, through Dr. Stevenson and other witnesses, his attorney asserted that Marianne was a medically-fragile child who suffered from a rare condition known as VATER Association.[4] As a result of that condition, she had undergone approximately 25 surgeries, including multiple abdominal organ transplants. Defense counsel also cross examined the State's medical experts about a fall that Marianne had experienced about three weeks earlier on July 17, 2010. On that occasion, Marianne tripped in the kitchen and fell face-first onto the floor, hitting her nose. A few days later, a doctor examined the child during a regularly-scheduled visit and concluded that her nose

---

[4] This condition is now more accurately known as VACTERL Association due to the recognition of additional potential defects. It typically refers to the presence of at least three of a recognized group of birth defects tending to have a non-random occurrence. Because the numerous transcript references use the term "VATER," we use it here.

was fine. In the days following the fall, the child was not lethargic and she engaged in normal activities. On July 25, 2010, however, the child awoke with a bruised, swollen nose and yellow drainage. The child's mother took her to the hospital, where a CAT scan revealed two nasal fractures. Marianne underwent emergency surgery to treat an infection behind the fractures, and she remained hospitalized until August 3, 2010 while receiving intravenous antibiotics.

{¶ 8} Defense counsel theorized at trial that the large subdural hematoma Marianne experienced two days later on August 5, 2010 may have been related to the child's complex medical condition, the fracture she experienced when she fell on July 17, 2010, and the resulting infection she suffered. In particular, defense counsel suggested that Marianne's fall on July 17, 2010 may have caused a small hematoma that re-bled and became larger when the child jumped or fell from her bed on August 5, 2010. Dr. Stevenson, the treating pediatric neurosurgeon, agreed that such a scenario "theoretically" could occur if there was an older, minor subdural hematoma followed by "a repeat trauma to the exact, same place." He added, however, that he had *never* seen such a situation and did not see evidence of an older, minor hematoma when treating Marianne. There was no evidence from any witness that she had reinjured her nose. Dr. Stevenson also testified that he had seen the facial CAT scan that had been taken earlier, which had revealed the broken nose, and although it only shows limited images of the brain, there was no indication of a prior clot and no indication of a shift of the brain from left to right. Finally, Dr. Stevenson found no connection between Marianne's serious injury and either her VATER Association or her recent nasal fracture. As indicated in testimony previously quoted, he testified there was nothing to suggest a prior minor chronic

hematoma.

{¶ 9} Dr. Kathi Makoroff, who was called by the State, is a pediatrician who specializes in child abuse and is board certified in that field. She has been practicing in that capacity at Cincinnati Children's Medical Center for 17 years. At the time of her March 2014 testimony, she said she was the chair of the Ohio Chapter of the American Academy of Pediatrics Committee on Child Abuse and Neglect, and president of the Ray Helfer Society, an honorary society for physicians practicing in the area of child abuse. She was a consultant in Marianne's treatment, and ruled out causes of the child's subdural hematoma other than a traumatic injury involving "a great bit of force." She explained: "We do see these types of injuries in kids who have severe car accidents and are ejected from the car or [in] very severe accidents. Kids who have very severe falls, like falling out of the—out of a window, you know, not on the first floor of the house but subsequent floors of the house, and we also see it in children with inflicted injury or abusive head trauma when they come in and they have injuries similar to—to—to what we see on [Marianne's] CAT scan." (T-2, 65). Dr. Makoroff ruled out as a possible cause of Marianne's injury a jump or a fall from the child's bed:

So I could also rule out that history of a—of a roll off of a bed or even a jump off a—off of a bed from something so small, you know, thirteen inches off of the floor and onto carpet, which, you know, obviously has some padding to it; the carpet itself has—has some padding properties to it. And so I'm left with inflicted injury or abusive head trauma.

* * * Right so it goes back to your question about the amount of force required. So even though we can't give you—we can't give you a number

of the amount of force, it certainly lies between kids who, and you know, most people know someone—know a child and maybe some of the Jurors were that child who, you know, went down the steps on a skateboard because it was fun, or was klutzy or climbed a lot and had lots of falls, and those kids don't end up like this. Those kids don't come into the emergency room emergently and then require surgery to evacuate the blood. So even though those kids are either klutzy or very sort of rambunctious and often doing things and—and hitting their head requiring sutures or staples, you know, to—because they're hitting their head and getting—and getting lacerations, they still don't—they still don't cause these types of injuries. But the really more forceful types of mechanisms, like a car accident, do. So the answer to your question is even the rambunctious child who is maybe jumping on the bed and even hits their head in the room, just—just—it's not—it's not enough injury to cause this type of subdural.

* * * So again, I can't rule out there wasn't an impact to her head; I mean she doesn't have a skull fracture, but just because there isn't a skull fracture doesn't mean she wasn't impacted especially if she was impacted onto a soft surface. That may be enough of an impact to cause injury, but not enough of an impact, or an impact onto the wrong type of surface to cause a skull fracture. Or certainly a shaking; if she was picked up and shaken violently, that would cause these types—this type of subdural, these types of injuries. And of course there's no impact there; she wasn't actually impacted onto a hard or soft surface, which would go along with her not

having a skull fracture.

(T-2, 72-78).

**{¶ 10}** Dr. Makoroff stated that even a prior minor subdural hematoma, followed by "a trivial fall like falling out of a bed thirteen inches" high, would not have caused Marianne's injury. She opined that the child's injury was caused by "abusive head trauma," which she explained is the current terminology for what previously was known as "shaken-baby syndrome." Dr. Makoroff testified that "shaken-baby syndrome" is an "old term" that means the "same exact thing" as "abusive head trauma." In essence, Dr. Makoroff used the process of elimination to conclude that Marianne's injuries were not accidental.

**{¶ 11}** Dr. Makoroff also rejected the scenarios proposed by defense counsel. Her opinion ruled out the possibility that a "short fall" could have caused Marianne's subdural hematoma on August 5, 2010. She testified that a "short fall" potentially could "cause a subdural" but not a large one like this child suffered:

> [Y]es, injury – a fall, and I have seen these – these cases my – myself, many of them, where a fall does cause a – a subdural. In those cases, there is frequently a skull fracture, and then there is a small amount of subdural blood underneath the skull fracture, and no damage to the surrounding brain at all. So I just want to be clear that I would answer your question yes, a short fall can cause a subdural, but no a short fall wouldn't cause a subdural like [Marianne] suffered.

(T-2, 92).

**{¶ 12}** Dr. Makoroff also rejected the idea that the hematoma on August 5, 2010

was a "re-bleed" of a prior hematoma that resulted from the child's earlier fall and nasal fracture. She explained:

So first of all I can rule that out with [Marianne]. Now to be very clear, when she had a CAT scan for her nose, they didn't image all of her brain; they imaged a good part of it in looking at the note, but they didn't do a brain CT, they did a facial CT on her, so they did see a good bit of her brain in that it all looked normal. So for your theory to work, she would have had— had to of had a large enough subdural initially, and they would have picked it up on that CAT scan. So I can feel confident saying no for that reason. I can feel confident also saying no because if [Marianne] suffered a re-bleeding, she would not have been symptomatic the way she was. She— she was not really conscious, and her brain was being affected by the re-bleed, and that's never really been described in re-bleeding, and she required neurosurgery to take out the blood. And so that's why I can rule that out.

I can also rule it out because Dr. Stevenson, and I talked to Dr. Stevenson after the surgery and read his operative report, would have seen this within the hematoma. He would have seen a bunch of older, trying to heal blood, with new blood as well. And he did not see that.

(T-2, 94-95). Also in response to defense cross examination, she stated:

So as you pointed out, I wasn't there, you weren't there, so I – I don't know what happened, you don't know what happened, but I can tell you what didn't happen. So it wasn't related to any of her past medical history.

It – it wasn't a direct cause of her nasal fracture from – from July, and it didn't happen from her falling off of a bed or even jumping off of her bed and jumping into something in her room, if that in fact happened.

(T-2, 100-101).

{¶ 13} Dr. Makoroff was also cross examined in regard to a study in which a short fall resulted in a subdural hemorrhage. She expressed ample familiarity with the study of Dr. John Plunkett regarding falls from playground equipment, which some have used to support that a subdural hematoma, and even death, can result from a short fall. Ultimately though, her testimony was as we previously quoted, "a short fall wouldn't cause a subdural like [Marianne] suffered." (T-2, 92).

{¶ 14} On re-direct examination, Dr. Makoroff also testified that very few accidental falls in children "result in retinal hemorrhages" and that the retinal hemorrhages Marianne experienced were larger and "more diffused throughout the whole retina" than what might occur in a short fall. Dr. Makoroff added:

> * * * So when we see retinal hemorrhages we don't—we—we—we— we, you know, again, it's a very sort of short list of medical causes; many of them the same as subdurals that can cause retinal hemorrhages, none of them [Marianne] had. And so then if we are left with injury, same thing as what I just testified to. Short household falls, even if we say they can cause retinal hemorrhages, which is rare, they don't cause retinal hemorrhages to the degree of which [Marianne] had.

(T-2, 116).

{¶ 15} Dr. Michael Gray, a pediatric ophthalmologist at Cincinnati Children's

Hospital, testified that the retinas of both of Marianne's eyes had many and diffuse multi-layered retinal hemorrhaging. He said there could be several causes for this, and he looks for bleeding problems, infection in the eye, or a history of trauma. Regarding trauma he testified "generally it's to cause hemorrhages or bleeding in the retina, it would have to be severe trauma; usually head trauma." (*Id.* at 124). He also testified that swelling of the brain, "brain edema by itself does not lead to retinal hemorrhages." (*Id.* at 135).

{¶ 16} As indicated, Jones' defense at trial consisted primarily of his attorney cross examining the State's witnesses about Marianne's multiple medical problems, the possibility of re-bleeding of an old hematoma, whether a short fall could cause a subdural hematoma, and the several possible causes of retinal hemorrhage. Counsel was able to obtain several admissions regarding the possibility of the defense theories though not sufficient for the State's witnesses to alter their opinions. Defense counsel called no experts to rebut the prosecution's experts. The only defense witness was Jones. He testified that he went upstairs and found Marianne on the floor, limp and non-responsive. He denied striking, throwing, or shaking the child. He also denied becoming angry or frustrated with the child. He testified that he had no idea how her injuries occurred.

{¶ 17} In closing argument, the prosecutor stressed that "no doctor or any other witness ever said there is an old injury that's related to the injury [Marianne] suffered on August 5, 2010." The prosecutor described Jones' "story" as "simply inconceivable" and argued that it "defies medical evidence[.]"

{¶ 18} After considering the evidence presented, the jury found Jones guilty on one count of child endangering. The trial court imposed an eight-year prison sentence. This court affirmed on direct appeal, rejecting arguments challenging the manifest weight

and legal sufficiency of the State's evidence and an argument alleging prosecutorial misconduct. With regard to the weight and sufficiency of the evidence, this court reasoned:

> In the case before us, the circumstantial evidence is compelling that Jones physically abused Marianne, and thereby caused her serious physical harm. When Marianne was left in his care, she did not have the brain injury that she had after she was in his care. He was the only adult in her presence. By his admission, the three other children in the house were on another floor, playing a video game.
>
> Drs. Stevenson and Makoroff ruled out possible causes of Marianne's injury other than physical abuse, either in the form of impact to Marianne's head against a soft surface, or severe shaking. Under the circumstances, a reasonable trier of fact could conclude that Jones was the person who caused Marianne's injury, if not intentionally, at the very least recklessly, since a reasonable person would know that the impact to Marianne's head or the severe shaking necessary to cause her injury would likely cause her serious physical harm.

*State v. Jones*, 2d Dist. Miami No. 2014-CA-11, 2015-Ohio-196, ¶ 30-31.

## II. Post-Conviction Proceedings

{¶ 19} In December 2014, Jones filed an R.C. 2953.21 petition for post-conviction relief with supporting evidentiary materials. (Doc. #43). Those materials included an affidavit and report from Dr. Robert Rothfeder, a board-certified emergency room physician with more than 30 years of experience in emergency medicine involving all

varieties of adult and pediatric trauma, including brain-injury cases. The materials also included an affidavit from Kenneth Monson, a PhD associate professor in mechanical engineering and an adjunct assistant professor in bioengineering at the University of Utah, and an affidavit from Dr. Marvin Miller of Dayton Children's Hospital addressing the proper terminology for VATER Association. Finally, the materials included an affidavit from Jones' trial counsel, Andrew Wannemacher, who explained that he knew he needed the assistance of an expert witness and that his failure to obtain one was not a "strategic move."

**{¶ 20}** One of the documents attached to the post-conviction submission was the first page of an apparent two-page UVMC "CT Head C" scan report which, appellant points out, stated: "[T]here is a left hemispheric acute on chronic subdural hematoma." What appellant does not reference is that the document also states: "Given the acute on chronic nature of this finding, nonaccidental trauma must be suspected." (Petition, Exhibit E). The trial court scheduled the post-conviction petition for an evidentiary hearing.

**{¶ 21}** The trial court held a three-day hearing on Jones' petition in May and June 2015. Jones presented testimony from Dr. Rothfeder and attorney Wannemacher as well as the videotaped deposition testimony from Monson. The State countered with testimony from its own expert, Dr. Robert Shapiro from Cincinnati Children's Hospital.

**{¶ 22}** Dr. Rothfeder, also a lawyer, trained as an internist and practiced as an emergency-room physician for more than 30 years, a discipline in which he was board certified in 1996. He treated adults and children and estimated that about half were children. He left emergency-room practice in 2006. He said he continued with a part-time, about one-half, clinical practice until he retired from patient care at the end of 2013. He

has not had a practice dedicated specifically to pediatrics, and he is not a neurologist. He said that over the past ten years he has developed a focused interest in child abuse and infant brain injury. He spends the vast majority of his professional time consulting on medical issues most of which are child abuse head-injury cases. In the last ten or fifteen years, he has testified only for the defense. He estimated he has testified between one and two hundred times on this topic.

{¶ 23} Based on his review of the case, including Marianne's extensive medical records, Dr. Rothfeder opined that the child's serious medical problems related to VATER Association made her more "fragile" and vulnerable to the injury she sustained in this case. Dr. Rothfeder has encountered only a "couple" VATER Association patients in his career, but his treatment of them was for something peripheral. He acknowledged he has no clinical experience working with children with this association. (T-PCR-1, 23). Yet he opined that she was generally a "fragile" child who was "more vulnerable to injury of any type. * * * I mean what she's made of just isn't as strong and viable as the tissue would be in a normal individual." (*Id.* at 41).

{¶ 24} Dr. Rothfeder explained that he had reviewed a CAT scan of the serious subdural hematoma taken after the incident. Although he was not specifically qualified as a radiologist or neurologist, he opined that the scan revealed the presence of "new" blood and older blood, signifying the existence of a "chronic subdural" and an "acute subdural"

> * * * [W]hen you look at the scan there's—there's mixed density in the hematoma. In other words, the—the—the tissue and the blood products that are seen on the scan look different in terms of the white and black densities depending on the composition of the fluid and in this scan there

was a mixed density which indicated that the subdural consisted of a chronic subdural, that is blood which had been present for a period of time which was not new and which had been present for at least a number of weeks and possibly longer, perhaps months even. And within that there was acute bleeding. So there was new bleeding into the chronic subdural and that— that's a phenomenon that we refer to as re-bleeding of a chronic subdural and something that's seen not uncommonly with chronic subdurals.

(T-PCR-1, 26-27). Notably, however, the CAT scan itself was not separately introduced into evidence. Nor was the original radiologist's report, the first page of which we indicated was attached to the petition, otherwise entered as an exhibit. Nor was the radiologist called by Jones' counsel in post-conviction proceedings even though the petition argued, in "Ground III" of the incidents amounting to ineffective assistance of counsel, that Jones' trial counsel was deficient "when his attorney failed to call the Upper Valley Medical Center treating physicians and radiologists as witnesses." (Petition at 38).

{¶ 25} When asked, Dr. Rothfeder did not render an opinion within a reasonable degree of medical certainty as to the cause of what he surmised was a chronic subdural hematoma, and he could not indicate when it originated. Rather, he indicated that "one of the possibilities" was Marianne's fall on July 17, 2010, which resulted in the nasal fracture and infection. He added:

* * * However, it's entirely possible that you know other unwitnessed head trauma that the child might have had at some point in the past could have caused it or medical condition that's—that complicated things could have caused it. For instance, when the nasal hematoma and the result[ing]

infection occurred, a potential complication of an infection in the head like that would be clotting or thrombosis in one of the veins inside the head that—that feeds the dura or that drains the dura and it's known among other things that—what we call cortical venous thrombosis. Thrombosis of one of those veins can be a cause of subdurals. So a variety of possibilities are— are in play and the—the only one that I can really identify specifically as potentially causative would relate to the—the trauma that caused the nasal fracture ten days or a couple of weeks preceding the August event.

T-PCR-1, 30.

{¶ 26} With regard to the acute subdural hematoma that led to Jones' conviction, Dr. Rothfeder testified:

* * * The way that chronic subdurals can re-bleed relates to the specific anatomy and pathology of the subdural. Once a chronic subdural forms, a membrane forms over the subdural and the membrane contains tiny little immature blood vessels and those—those vessels are subject to re-bleeding and it's thought that re-bleeding in these instances, in these small blood vessels in the membrane of a subdural can—it's thought that those things—that re-bleeding of these things can occur in the absence of trauma, spontaneously or with mild trauma which might otherwise be incidental. Now understand that what I'm talking about now is not the type of phenomenon that is now well understood or completely understood or has been you know historically clarified over time. It's not the kind of thing that physicians have a perfect handle on. So everything I'm talking about

remains in a – a state of incomplete understanding as – as medicine presently exists.

(T-PRC-1, 31-32).

{¶ 27} Dr. Rothfeder further testified that one of the underlying bases for his opinions was that "on top of that [his chronic re-bleed possibility] one thing we haven't discussed *but I believe is contributory* is the fact that on top of everything else, blood testing when she was admitted to Cincinnati Children's indicated that the state of her blood coagulation was not normal at that point in time." (*Id.*) (Emphasis added). In more than three pages of transcript testimony, he specifically described this poor coagulation and how "it would have contributed to the expansion of the new bleed." That testimony is similar to the portion of Dr. Rothfeder's affidavit, submitted with the petition, where he was critical of Dr. Makoroff's trial testimony to the effect that Marianne's coagulation was normal. He went on to expound upon how the abnormal coagulation made this case "as complex in terms of many different things going on as any I've seen," (*Id.* at 33). And, he testified her coagulation "was not safe." (*Id.* at 36). But he was wrong. On cross examination, it was pointed out that he had incorrectly referred to the coagulation testing from 9:16 p.m. in the evening of admission, after the intensive medical intervention of a two-hour brain surgery with multiple medications, and not the coagulation testing at the time of admission at 4:40 p.m. in the afternoon. He had to admit that he was incorrect and, contrary to his affidavit and hearing testimony, that her coagulation studies were normal upon admission when the hematoma had already formed.

{¶ 28} Dr. Rothfeder did acknowledge that what looks like "new" blood and "old" blood when analyzing a hematoma on a CAT scan can be new blood that's moving. In

his opinion, formed from review of only the CAT scan, "that did not appear to me to have been the case with this mixed density [blood]." When Rothfeder was cross examined about Dr. Stevenson's testimony that Stevenson saw no old blood upon surgically viewing Marianne's brain, Dr. Rothfeder testified he relies on "what I've been told by neurosurgeons" (*Id.* at 49) that it is entirely possible that evacuation of an acute hematoma wouldn't allow visualization of old blood somewhere else in the subdural space. So, in Dr. Rothfeder's estimation, the absence of old blood doesn't rule out its presence. However, his direct testimony about his own reading of the CAT scan had been that the old blood and new blood was in the same place. After describing what he believed was a chronic subdural, he said that "within that [his suspected chronic subdural] there was acute bleeding. So there was new bleeding into the chronic subdural ** * *." (*Id.* at 27).

{¶ 29} With regard to the cause of Marianne's injury on August 5, 2010, Dr. Rothfeder opined: "* * * I mean this is the farthest thing from a—a simple case to attempt to analyze and—and draw conclusions from and—and I think that—that really explains the—you know the opinions that I'm attempting to express here in saying that I don't believe it's—it's really possible to draw definite conclusions in terms of the cause of that acute subdural with any reasonable certainty." (*Id.* at 33). In his ultimate conclusion, Dr. Rothfeder stated: "I don't think that given everything I've discussed that it's possible to—to conclude that those injuries were the result of child abuse." (*Id.* at 37). A fair evaluation of his testimony is that he does not believe in the diagnosis of abusive head trauma because one cannot divine intent from an unobserved mechanism of injury. He agrees the diagnosis is accepted by the majority of pediatricians and the position papers of the

number of organizations that support the diagnosis, which he gratuitously referred to as "the political statements that derive from those organizations." (*Id.* at 54).

**{¶ 30}** On cross examination, Dr. Rothfeder expressed his belief that a biomechanical engineer would be better suited than Dr. Makoroff to assess whether a short fall could have caused Marianne's injury. While acknowledging that biomechanical engineers typically do not work in emergency rooms, he explained: "Well, the—if the— the kinematics and so forth of an injury were rarely—were really rarely contributory to what I was doing in the emergency room. I mean for instance if—if someone comes in you know with a history of a particular injury, my job is to diagnose and treat the injury." Concerning Dr. Makoroff's opinion, and consistent with his rejection of the abusive head trauma diagnosis, he added:

> * * * [W]e're not dealing with an issue of medical treatment. Dr. Makoroff's role in this case didn't involve contributing to the treatment in this case. It involved coming to a medical legal conclusion and I think that physicians have nothing more than anecdotal experience to attempt to conclude for instance whether a you know a—a particular short fall could have caused a given injury. That's why I'm critical.

(*Id.* at 46).

**{¶ 31}** With regard to the alleged "abusive head trauma" at issue, Dr. Rothfeder opined that "the medical diagnosis really is head trauma" and that "whether it's abusive or not is a medical legal conclusion."

**{¶ 32}** Dr. Rothfeder additionally maintained that the presence or absence of retinal hemorrhages in this case had no diagnostic value to him, partially because he

believed they could have been caused by the "presence of an expanding subdural hematoma" (*Id.* at 52) itself, which in his opinion had an uncertain cause. Rothfeder was not qualified as an opthamologist, and the foregoing opinion was directly contrary to the previously quoted testimony of Dr. Gray, the only ophthalmologist who testified in this record. Finally, he disputed whether severe shaking ever can damage bridging veins in the brain and result in a subdural hematoma.

{¶ 33} Jones' other expert witness, Kenneth Monson, testified via video deposition. Monson, who holds a doctorate in mechanical engineering, also did three years of post-doctoral work in conjunction with the Department of Neurosurgery at the University of California San Francisco. There he collaborated with neurosurgeons in studying the application of force and resulting trauma. In addition, he filled a research position at a brain and spinal injury center. His doctoral thesis involved "mechanical and failure properties of human cerebral blood vessels." The study concerned "the response of the cerebral blood vessels to head trauma."

{¶ 34} Monson testified that, based on his experience and study, the acceleration levels from shaking someone are too low to produce a head injury such as bleeding on the brain. According to Monson, the lowest level of G-forces that might injure a six-month-old child is 50Gs, whereas a subdural hematoma might be expected to result at around 85Gs. Monson testified, however, that the peak accelerations associated with shaking are around 15Gs. He stated that these numbers are peer reviewed and generally accepted. He testified that greater G-forces would be required to injure an older child.

{¶ 35} Monson also discussed "short falls" that might occur inside a residence. He recognized that a multitude of variables must be considered to assess whether the force

involved could produce a given injury. They include the height of the fall, whether the head impacted, what part of the head impacted, the characteristics of the floor, whether anything broke the fall, any physical acceleration before the fall (such as jumping or running), etc. With regard to Marianne's specific injury at issue, Monson, who admits he is not trained in medicine (Monson Depo. at 51), opined:

So, if—if she had been standing on the bed, for example, and somehow managed to get herself to the point of the floor, whatever that was—I don't know what the distance from the bed was where she was found, so I don't know if that's feasible.

But if she were standing on the bed and fell and hit her head, there would be—and I should say, if it were an unprotected fall—if she struck her head squarely on the floor without any protection, then that would produce a significant acceleration that would potentially be in the ballpark of what we have been talking about for injury thresholds.

If we—if we talk about—and I should say this is all for a healthy infant—or for a healthy child. There—there aren't really any data out there suggesting that—that the child has previous—a pre-existing condition like chronic bleeding, chronic subdural—I think that, based on my review of the records, there was actually mixed density blood in the CT scan suggesting that there was blood before, you know, that would have been present days before this particular incident.

But, anyway, so that matters, but falling off the bed if she is standing on it is different from if she is standing in the middle of the floor and

somehow fell down, which is also different from if she is lying on the bed and rolls off the bed.

Clearly, those different scenarios in order of decreasing height become less and less severe and—to the point where I don't think you could achieve the levels of acceleration required to produce injury from that—from rolling off that 13-inch bed.

(*Id.* at 40-41).

**{¶ 36}** In Monson's opinion, depending on how such a fall occurred, the range of possibility of a serious injury would go from "almost impossible to do it to it could happen." More specifically, he explained that "the accelerations could range from, you know, significantly over 100Gs down to 0, basically." Monson stated that he was unaware of any *observed* case in which shaking had produced a subdural hematoma. He was aware of an observed case in which a "short fall" had produced such an injury.

**{¶ 37}** On cross examination, Monson conceded that serious injuries from short falls are "pretty rare" and "quite unlikely." (*Id.* at 67). He also stated that he could not draw a conclusion in the present case as to whether a short fall in fact produced Marianne's injury. Monson recognized that if Marianne had been shaken and then "slammed" against something causing an impact, the slamming would significantly increase the acceleration and deceleration levels. He reiterated, however, that "the accelerations associated with shaking are very low compared to the thresholds for injury * * * like a subdural hematoma[.]" (*Id.* at 82). Finally, when asked whether the injury in this case was from a short fall he said "I can't actually draw an opinion on what - - what caused it." (*Id.* at 68).

**{¶ 38}** Jones' final witness, Andrew Wannemacher, testified about his efforts as

defense counsel at trial. Specifically, he discussed his cross examination of the State's medical experts. Wannemacher also admitted realizing, at the outset of his involvement, that "there needed to be an expert for the defense to not only explain the medical documentation that had been provided by the State, but also to counteract Dr. Makoroff's shaken baby syndrome or abusive head trauma" theory. Wannemacher explained that he did file a motion for a medical expert. He recalled the trial court required him first to get a medical opinion that an expert would be helpful to the defense and to provide a fee estimate. To do that, Wannemacher contacted a Dr. Miller at Dayton Children's Hospital, who agreed to review the documentation but refused to participate as a trial witness. Wannemacher testified that Dr. Miller never followed up, or indicated whether he had reviewed any materials. Wannemacher never received an opinion from him. Wannemacher contacted other doctors but concluded on his own that their fees were beyond what the trial court would authorize. As a result, he never obtained an expert witness to assist with the defense. He also never consulted a medical or biomechanical expert to determine whether a short fall could have produced Marianne's injury. Wannemacher testified that he reviewed approximately 2,000 pages of medical records himself but did not "adequately understand what they meant." He testified that his failure to obtain the assistance of an expert witness was not a strategic decision. After the first case against Jones was nolled, and then refiled, Wannemacher did not refile his motion for an expert witness because he assumed that he would not be able to get one. According to Wannemacher, he would have called a medical expert to testify if he had one.

{¶ 39} The only other witness at the hearing was Dr. Robert Shapiro, a child-abuse

pediatrician from Cincinnati Children's Hospital, who was called to testify by the State. Dr. Shapiro is the director of the Mayerson Center for Safe and Healthy Children at the hospital, is an attending physician there, and is board certified in both pediatrics and child abuse pediatrics. He has been practicing pediatrics for over thirty years in Ohio and previously for seven years in New York. He has testified in court in those fields about twice a month for the last 25 years and estimated the totals would be between 400 and 500 times. Although he said he almost always testifies on behalf of the prosecution, he did serve as an expert for the Baltimore Public Defender's Office. He has reviewed "lots and lots of cases for the defense" (T-PCR-2, 38), but if he made a determination that child abuse was not warranted, "the case doesn't go," so he has only testified in court a couple of times for the defense. (*Id.* at 38-39).

**{¶ 40}** Based on his review of the records in this case, Dr. Shapiro agreed that Marianne was a "very complex medical patient" (T-PCR-2, 19). But he rejected Dr. Rothfeder's opinion that the child's VATER Association or any other existing medical complications predisposed her to, or contributed to, the injury she suffered on August 5, 2010. He observed that her liver was functioning well, which is critical because that is responsible for many aspects that keep a child from bleeding (T-PCR-2, 15). He also disagreed with Dr. Rothfeder's opinion that a short fall could have produced a subdural hematoma like Marianne experienced that day. According to Dr. Shapiro, the child's injuries were consistent with abuse rather than a short fall. Dr. Shapiro also opined that biomechanical engineering studies cannot accurately assess the forces generated from different traumatic events involving children. With regard to the latter, he explained:

> I would tell you that the biomechanical studies are flawed right now

and too limited to be abuse (sic) [of use] to making a diagnosis and understanding cause and effect. That's not to say that I don't have hope one day that biomechanical studies will be more informative in this area and they are still undergoing but it's a remarkably difficult thing to study. The head is far more complex than a lake. We barely have biomechanical studies to understand what happens when a child falls. It's way too complicated in terms of mass of the child, size of the bone, angle that the bone strikes, the manner that the child fell, how the bone ends up, what parts of the other parts of the body, so we're beginning to understand a little bit more about what type of all, stair falls might result to what type fractures. The head is unbelievably more complex than a femur. And we have – we probably actually have – will never have any way to understand why type of angular and other forces are required to cause a bridging vein to rupture and what different individual factors are involved, so do I actually have hope that biomechanical engineers will actually be able to tell us what actually happens? No, I actually don't. Maybe they will. I can tell you that we have lots of data and lots of experience from accidental falls, from witnessed falls, we have lots of experimental data that tells us about children who we know have been abused because of a multitude of other reasons who have injuries exactly like [Marianne] has and we have lots of experience knowing what kinds of injuries happen to kids who fall. So that's the data that we have. That's good data. It's not biomechanical data.

(T-PCR-2, 51-52).

{¶ 41} Dr. Shapiro compellingly contradicted Dr. Rothfeder regarding whether Marianne had an older, chronic subdural hematoma and a newer, acute subdural hematoma, i.e., "old" blood and "new" blood, giving four distinct reasons why Rothfeder's supposition is incorrect.

* * *A number of reasons. So the radiographic appearance actually shows as you correctly said mixed densities on the CT Scan. And what the CT Scan shows is the radiographic appearance from the computed tomography scan of what is inside the cranium. And there is – there is fluid between the brain and the sku (sic) – skull, that's within a particular space that is correctly referred to as a subdural compartment, subdural space and it shows a mixed density. [Rothfeder] is correct about that. The interpretation of what those mixed densities are cannot be determined with any reliability based upon the CT Scan alone. One explanation is exactly as he states, that it's old blood with new blood bleeding into that space and mixing with the old blood. That is one possibility. Then the other possibility is that this is all new blood that shows different densities because what we believe is movement of the blood, in other words active bleeding. So an informed radiologist cannot make that determination and I am aware that many radiologists are – are not current and they believe that they know and they're – they don't, they're wrong. So that's number one. Number two, in this particular instance, [Marianne] had a CT Scan of her sinuses for evaluation of the nasal fracture and there was less than two weeks, I don't forget- I don't remember the exact number of days, maybe ten, eleven days

apart. That CT Scan shows us the space between the brain and the skull, the subdural space. We don't see the entire subdural space but we see the frontal lobes and there is no fluid in there. So in terms of chronic or even – chronic blood on top of old blood well it would have been there, should have been there at the time and there was no evidence that it was there. So in this case, although radiographically we can't say whether this is new blood on old or all new, we do have the benefit of a fairly recent CT Scan and the blood was not there. So that's a powerful argument to suggest that this is not new on top of chronic but it's all new. And then lastly, not lastly, number three, this child had surgery and the neurosurgeon opened the child's skull and looked at what was in there and saw no evidence of chronic subdural. So we wouldn't expect chronic subdural and the neurosurgeon didn't see any chronic subdural. And then number four, we recognize that there is a possibility that children who have abnormal subdural space, which would be chronic subdural fluid in the space, that they might re-bleed, they might have bleeding on top of that chronic fluid with minimal impact. This is area-actually a area of study that we are still learning about. We – we know a limited amount. Some people actually don't believe that this predisposes children. I have – I happen to be somebody who does believe that it – it does predispose to bleeding. However, the bleeding that it predisposes to has nothing to do with the kind of bleeding and life threatening event that [Marianne] had. So, I would tell you that beyond a reasonable degree of medical certainty this is new blood and we had absolutely no reason to

believe there's old blood in there and we have some evidence to suggest that there was no old blood in there.

(T-PCR-2, 24-26).

{¶ 42} Dr. Shapiro also rejected Dr. Rothfeder's opinion that Marianne's retinal hemorrhages had no diagnostic value. Dr. Shapiro agreed that retinal hemorrhaging is not "pathogonomic" (meaning a definitive diagnostic sign indicative of a particular condition) but he testified it was irresponsible to ignore it. Dr. Shapiro also disagreed with Dr. Rothfeder's opinion that the existence of the subdural hematoma itself may have caused the retinal hemorrhages in this case. He stated: "It doesn't cause hemorrhaging like we saw in [Marianne]." (*Id.* at 30).

{¶ 43} Dr. Shapiro testified that he disagreed with Dr. Rothfeder's suggestion in his report that a short fall could have caused Marianne's injury.

* * * He is right, and I agree, that short falls can at times cause unexpected intracranial injury including bleeding and we – I recognize this. Sometimes remarkably minimal impact results in intracranial bleeding. The – the types of bleeding that occurs from a short fall is not the type of bleeding and not the scenario that we see in [Marianne]. Typically, short fall bleedings – bleeding from short falls will be directly on the site of impact. [Marianne]'s was in the classic distribution that we see in kids who have suffered shaken injuries. And children who have trauma and head injury from short falls will, at most, have very minimal retinal hemorrhaging. Typically, they will have no retinal hemorrhages, that's bleeding behind the eyes. When they do have bleeding behind the eyes, it's limited to a small

part of the retina. [Marianne] had bleeding in multiple layers and devastating bleeding. So, this is frankly as a physician it would be irresponsible for me to suggest that [Marianne's] intracranial injury was a result of a short fall.

* * *

* * * I've certainly seen kids who have unexpected injury from such minor falls as falling back on the back of the head. These are unusual, they can happen, but they don't look like [Marianne]'s injuries. So, it's my experience includes kids who fall off of couches, fall off of beds, fall off of changing tables, fall off of bunk beds, kids who fall off the swings, kids who fall in playgrounds, kids who get their heads knocked in sporting injuries, these are all bread and butter pediatric emergency medicine type findings and they don't look anything like the injuries that [Marianne] presented with.

* * *

(*Id.* at 16-18).

**{¶ 44}** With regard to whether abusive head trauma or shaken baby syndrome is widely accepted, Shapiro testified it is widely accepted in a large number of medical fields. In regard to those who do not believe in the diagnosis, he said:

* * * It's a tiny fraction of the medical community that speaks a very loud voice. There's broad acceptance and concurrence among neurosurgeons, neurologists, radiologists, pediatricians in the diagnosis of shaken baby syndrome. We have no debate. There is no debate in the medical field, except for a small handful of individuals who, for whatever reasons, feel that they need to speak very loudly about a so-called debate.

The debate is trumped up and doesn't exist.

(*Id.* at 33).

**{¶ 45}** In conclusion, Dr. Shapiro opined that Marianne's injury was inconsistent with an accident and was indicative of abusive head trauma. On cross examination, he elaborated on that opinion: "* * * But you've got retinal hemorrhages in multiple layers, you've got terrible intracranial bleeding, you got no serious trauma. So as a responsible physician, the—any diagnosis other than child abuse would be rather difficult to come up with." (*Id.* at 55).

### The trial court decision

**{¶ 46}** Based on the evidence presented, the trial court overruled Jones' post-conviction relief petition in an October 2016 decision and judgment entry. (Doc. #68). It held that attorney "Wannemacher's representation of the defendant was not objectively unreasonable, the defendant was not prejudiced by counsel's performance, and the defendant has failed to show that the result of the trial would not [sic] have been different but for counsel's representation." The trial court reasoned that Wannemacher had engaged in effective cross examination of the State's experts. It discounted Monson's expert testimony, pointing out that no biomechanical studies ever have been performed measuring the effect of forces on the brains of live humans. The trial court additionally found "little support" for Jones' "re-bleed" theory.

**{¶ 47}** With regard to Wannemacher's failure to secure any expert witnesses, the trial court concluded that counsel's failure to do so "does not rise to the level of ineffective assistance of counsel, since the defendant has not shown a reasonable probability that the testimony of additional experts would change the outcome of this case." The trial court

found that Dr. Rothfeder's testimony about short falls and retinal hemorrhages was "called into question" by the contrary opinions of Dr. Makoroff and Dr. Shapiro, who the trial court found more credible largely because Dr. Rothfeder lacked "clinical experience" to testify about a child with Marianne's "complicated and unusual medical conditions." The trial court also credited Dr. Shapiro's testimony that the nature of Marianne's retinal hemorrhages and extensive subdural hematoma were inconsistent with a short fall. In addition, the trial court found no credible evidence of any "acute on chronic" re-bleeding.

{¶ 48} As for Monson, the trial court noted that his experience is laboratory in nature and that hospitals do not employ biomechanical engineers. The trial court determined that his testimony was not "particularly probative of the issues" in this case. The trial court also pointed out that Monson had discounted confessions involving injuries to shaken babies because the confessions might have been false or the defendants might have both shaken and struck the victims. The trial court then reasoned:

> Dr. Makoroff's testimony at trial was that [Marianne] suffered abusive head trauma, the likes of which are consistent with shaking and impact with a soft surface. The defendant was not prejudiced by trial counsel's failure to call an expert to testify on his behalf. [Marianne's] complex medical history causes Dr. Rothfeder to erroneously conclude she is chronically fragile and that must be why she was so badly injured. Dr. Makoroff and Dr. Shapiro, whose entire careers have exclusively involved the care and treatment of children, have the necessary medical training and clinical experience to know, to a reasonable degree of medical certainty, that [Marianne] suffered abusive injuries, consistent with their experience with

both abuse injuries and accidental short falls. The proposed expert testimony would not have discredited Dr. Makoroff or Dr. Stevenson's testimony and would not have affected the outcome of the case.

**{¶ 49}** Finally, the trial court found no ineffective assistance of counsel based on Wannemacher's failure to call witnesses from Upper Valley Medical Center to testify about the UVMC CT scan reference to an acute-on-chronic subdural hematoma or his failure to impeach Dr. Makoroff with UVMC records on that issue. The trial court reasoned that Wannemacher had conducted effective cross examination and that there was "little medical support" for the acute-on-chronic theory.

### III. Analysis of Present Appeal

**{¶ 50}** Jones has appealed from the trial court's denial of post-conviction relief. The governing statute, R.C. 2953.21, provides that "[a]ny person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief." R.C. 2953.21(A)(1)(a).

**{¶ 51}** We review a trial court's denial of post-conviction relief for an abuse of discretion. *State v. Sapp*, 2d Dist. Clark No. 2015-CA-43, 2017-Ohio-1467, ¶ 6. An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "A decision is unreasonable if there is no sound reasoning process that would support

that decision." *Parrett v. Wright*, 2017-Ohio-764, 85 N.E.3d 1067, ¶ 13 (2d Dist.). Moreover, we have previously indicated that we defer to the trial court's finding with regard to credibility in post-conviction proceedings. *State v. Hathaway*, 2015-Ohio-5488, 55 N.E.3d 634, ¶ 21 (2d Dist.). We have recognized that during an evidentiary hearing on a post-conviction relief petition, the trial court serves as the trier of fact and is charged with assessing the credibility of the witnesses. *State v. Robinson*, 2d Dist. Greene No. 2013-CA-33, 2014-Ohio-1663, ¶ 36; *State v. Hamilton*, 2d Dist. Clark No. 98 CA 98, 2000 WL 282303, *5 (March 17, 2000).

**{¶ 52}** Jones' petition alleged ineffective assistance of counsel, which can constitute grounds for post-conviction relief. *State v. Robinson*, 2d Dist. Greene No. 2013-CA-33, 2014-Ohio-1663, ¶ 20. He claimed ineffective assistance based on, among other things, Wannemacher's failure to retain one or more expert witnesses to assist in his defense. A defendant is deprived of effective assistance of counsel when (1) counsel's performance is deficient and (2) that deficient performance prejudices the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish prejudice, a defendant must do more than show that counsel's deficient performance had a conceivable effect on the outcome of the proceeding. *State v. Hathaway*, 2015-Ohio-5488, 55 N.E.3d 634, ¶ 12 (2d Dist.), quoting *Strickland* at 693. For ineffective assistance of counsel to cause prejudice, such a result does not have to be shown by a preponderance of the evidence. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694.

**Grounds asserted in the post-conviction petition**.

{¶ 53} Specifically, in his petition, Jones raises four distinct grounds as a bases for relief. We review these grounds and the trial court's disposition of them in an order that facilitates our analysis. The first raised ground is that trial counsel "failed to reasonably investigate and challenge the medical records in the case." (Doc. #43 at 32). The focus of this contention is that counsel should have done more to challenge Dr. Makaroff's opinions. Jones asserts that Marianne "did, in fact have a bleeding disorder" (*Id.* at 33), that a short fall could not be ruled out as a cause of the injury because Monson said a short fall is of much higher acceleration than shaking, and that Makaroff's elimination of a re-bleed possibility went unchallenged. Essentially, this ground of the petition claims the medical records demonstrate Dr. Makaroff was wrong on the issues of "bleeding disorder, short fall, and acute on chronic subdural hematoma." (*Id.* at 35). The trial court reasonably found no support for this ground, and we agree.

{¶ 54} With regard to the medical records supporting the notion that Marianne had a "bleeding disorder," the trial court concluded that contention was based on a "misstatement," which we characterize as a plain mistake, by the medical expert Jones presented. No further consideration of a failure to present evidence of a non-existent bleeding disorder is warranted.

{¶ 55} With regard to injury from a short fall, a term for which there is no apparent accepted definition, the trial court noted that the essence of Monson's testimony was only that impact from a short fall would produce larger accelerations than shaking. We believe in addition that Monson's testimony also supports a biomechanical opinion that shaking alone would not cause Marianne's subdural hematoma. But, in any event, we agree with

the trial court that Monson's testimony was "not particularly probative of the issues involved" in the post-conviction proceeding and would have had "negligible probative value." We note that although Dr. Makaroff testified that such an injury could result from being "shaken violently," her opinion of abusive head trauma included the potential of an "impact to her head" (T-2, 78) or slamming onto a soft or hard surface (*Id.* at 87). Her testimony that this type of injury "requires a great bit of force" (T-2, 63) is not inconsistent with Monson's. The inconsistency between Monson's testimony and that of Dr. Makaroff's is Monson's opinion that shaking alone does not result in sufficient G-force to result in an injury like Marianne's. We also note from the testimony that we have quoted, Monson's admission that he could not say Marianne's injuries were from a short fall (Monson Depo., 68) and that such results are "pretty rare." (*Id.* at 67). The trial court also considered the post-conviction testimony of Dr. Shapiro to the effect that Marianne's injury was not the result of a short fall. In sum, the trial court did not abuse its discretion by concluding that the post-conviction evidence about the possibility of a short fall would not have made any difference.

{¶ 56} In his petition, Appellant argues that "Dr. Stevenson admitted that he would not have been able to see the old blood because of the active bleeding in [Marianne's] brain at the time." (Doc. #43 at 34). We believe that argument is inconsistent with the entirety of Dr. Stevenson's testimony. Dr. Stevenson concluded there was no evidence of a prior subdural hematoma. We have also quoted Dr. Shapiro's testimony on the subject, which we referred to as compelling. On this record, no reasonable juror would conclude that Marianne had a prior subdural hematoma or a re-bleed thereof.

{¶ 57} Ground III of the petition asserts that counsel was ineffective when he "failed

to call the Upper Valley Medical Center treating physicians and Radiologists as witnesses." (Doc. #43 at 38). We observe that if this ground were sufficient to constitute ineffective assistance of counsel, a conclusion we do not embrace, current counsel has repeated it. Those potential witnesses were not called to the post-conviction hearing. Consequently, petitioner has presented no evidence that calling those witnesses would have made any difference. On this ground, the trial court wrote that "there is little medical support that there was an acute on chronic subdural hematoma that caused [Marianne's] hematoma. The CT scan from UVMC alone is not sufficient to make that determination. The CT scan reveals the possibility of mixed-density blood but that is not substantiated by the prior facial CT scan from her nasal fracture showing no subdural hematoma at all or Dr. Stevenson's observation of [Marianne] during brain surgery." (Doc# 68 at14).   We do not find the trial court was unreasonable in rejecting this ground for relief in the petition.

{¶ 58} Enumerated Ground IV of the petition states that trial counsel was ineffective when he "failed to impeach Dr. Makaroff with medical records that were readily available". (Doc.# 43, 40) The medical records specifically itemized are a) the UVMC records to contradict that there was no evidence of an acute on chronic subdural hematoma and b) the Children's Hospital records regarding a bleeding disorder. Petitioner argued that introduction of these records would have impeached Dr. Makaroff's testimony. In reverse order, there is no record that demonstrates a bleeding disorder at the time of admission to Children's. And, there is no reasonable possibility the UVMC CT scan record we have discussed at length would have had any influence on Dr. Makaroff's testimony let alone the speculation that it would have impeached her testimony. There is no reasonable probability that this ground would have impacted the trial whatsoever.

**Ground II, failure to retain an expert**

{¶ 59} The remaining Ground II for relief is that Jones' counsel was ineffective "when his attorney failed to retain an expert to provide trial testimony". (Doc. #43 at 35). In our opinion, because trial counsel did not sufficiently exhaust attempts to obtain the assistance of or the testimony of an expert witness, and he was therefore not in a position to make an informed decision whether or not to call an expert to testify, we conclude the trial court's decision finding no deficient performance by Wannemacher was unreasonable. Nonetheless, on this record, given the trial and post-conviction evidence, we conclude the trial court did not abuse its discretion by finding there is not a reasonable probability of a different result and denying the post-conviction motion for relief.

**A. Deficient Representation**

{¶ 60} We find it unreasonable to conclude that Wannemacher provided non-deficient representation by failing to engage an expert to assist in the defense and to allow counsel to be able to make an informed decision whether to have that expert testify. We do not dispute that Wannemacher himself prepared for the issues in the trial. A summary of Jones' contentions in his post-conviction evidence is that 1) Marianne was a complex patient, a fact that contributed to her injury, 2) there is a possibility of an acute-on-chronic hematoma, 3) a short fall can cause a subdural hematoma, 4) Marianne had a bleeding disorder, and 5) a retinal hemorrhage is not diagnostic. We eliminate the bleeding disorder because it did not exist. With regard to each of the other post-conviction contentions, Wannemacher's cross examination at trial and his testimony at the post-conviction-relief hearing both reflect significant preparation to show he was familiar with and inquired about each of the contentions raised in post-conviction, and he was able to

obtain several concessions from the State's witnesses.

{¶ 61} In the case of *Flick v. Warren*, 465 Fed.Appx. 461 (6th Cir. 2012), the Sixth Circuit Court of Appeals indicated in a 1998 shaken-baby death case that it was not ineffective assistance of counsel to decide not to further seek an expert after counsel received unfavorable responses from three doctors he had contacted for help. Under those circumstances, "effective assistance of counsel does not require counsel to continue contacting experts until he has found one." *Id.* at 464. On the other hand, here we conclude Wannemacher's efforts to obtain an expert were simply insufficient to demonstrate that he made a strategic choice to proceed without an expert. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* at 690-691.

{¶ 62} On this record, we see no sound reason for Wannemacher's admitted failure to retain an expert to assist with medical issues, and to put counsel in a position to make a strategic decision whether that expert should be called to testify. That failure was not "objectively reasonable" and was deficient. The evidence established that Jones and the child's mother had put the child down for a nap shortly before the injury. Jones testified in his own defense and claimed subsequently to have found the child on the floor unresponsive. The State's experts ruled out any other cause and opined that Marianne's condition must have been the result of abuse by Jones. At that point, although there were concessions about other potential causes of Marianne's injury, Jones should have been

in a position to decide whether to call an expert in his defense. Due to defense counsel's failure to retain an expert, he had little beyond Jones' own testimony to offer. We do not, and need not, resolve the question of whether Wannamaker, armed with the experts who testified in post-conviction, could have made a strategic decision not to call them after he had obtained some concessions on each of the medical issues called into question.

### B. Prejudice

{¶ 63} The remaining issue is whether Jones was prejudiced by defense counsel's failure to retain an expert and/or to call an expert to testify at trial to rebut the State's experts. The trial court found no prejudice to Jones based largely on its evaluation of the credibility of the competing experts. With regard to defense experts Dr. Rothfeder and Monson, the trial court found that the nature of their experience made them less credible than the prosecution's experts. It reasoned:

> The court found the testimony of defendant's experts, Dr. Rothfeder and Dr. Monson, to have negligible probative value in evaluating their criticisms of and differences with the testimony of Dr. Makoroff and Dr. Stevenson. This conclusion is based in no small part on the vast difference in clinical experience between [Marianne's] treating physicians at Cincinnati Children's Hospital and Dr. Rothfeder, and, in the case of Dr. Monson, the absence of clinical experience. The testimony of the defendant's experts does not demonstrate to this court a probability that the jury would have reached a different verdict.

{¶ 64} The trial court also found more credible the prosecution experts' testimony about retinal hemorrhages, the "re-bleed" dispute, the inability of a short fall to cause

Marianne's injuries, and abusive head trauma actually causing the child's injury. We recognize that "expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77. "The treatment of such testimony involves 'an issue of sufficiency, not admissibility.' "*Id.*, quoting *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 616 N.E.2d 909 (1993).[5] But when experts testify about a variety of possibilities or about underlying suppositions that are unsupported by the weight of the evidence, the strength of their opinions has less weight than those expressed to a reasonable medical certainty.

**{¶ 65}** As set forth above, Dr. Rothfeder opined that it would be impossible "to draw definite conclusions in terms of the cause of [Marianne's] acute subdural with any reasonable certainty" and that it would be impossible "to conclude that those injuries were the result of child abuse." (T-PCR-1, 17). But a fair reading of his entire testimony is that he would testify to that effect regardless of the medical aspects of this case because there was no witness to or admission about the mechanism of injury and in those circumstances he does not believe in the abusive head trauma/shaken baby diagnosis at all. (T-PCR-1, 37). The potential contributing causes Dr. Rothfeder identified were re-bleeding of a prior, chronic subdural hematoma, a complex patient with ongoing infection related to the earlier nasal fracture, a "short fall," and his mistaken bleeding disorder, none of which did he specify was the probable or reasonably certain cause of Marianne's injury. We previously indicated Appellant complains that in closing argument, the prosecutor seized on the

---

[5] A more cogent reason for allowing criminal-case experts to testify about "possibilities" is that the defense has no burden to prove what happened, but may raise reasonable doubt about what possibly may not have happened.

absence of any competing expert testimony at trial and "emphasized that 'no doctor or any other witness ever said there is an old injury that's related to the injury [Marianne] suffered'." (Appellant's Merit Brief at 6). Even if Jones' post-conviction medical expert had testified at trial, the preceding closing argument could still accurately and correctly have been made because that defense expert testified in terms of possibilities rather than certainty or probability. For instance, regarding the existence of a chronic hematoma, he stated: "So a variety of possibilities are in play * * *." (T-PCR-1, 30). And with regard to the possibility of spontaneous or mild trauma as a cause of re-bleeding, he said: "[W]hat I'm talking about now is not the type of phenomenon that is now well understood or completely understood or has been you know historically clarified over time. It's not the kind of thing that physicians have a perfect handle on. So everything I'm talking about remains in a – a state of incomplete understanding as – as medicine presently exists." (*Id.* at 32). Moreover, had the defense called Dr. Rothfeder at trial, his mistaken testimony about Marianne's non-existent bleeding disorder, which he said contributed to his analysis, likely would have resulted in further loss of credibility with the jury.

{¶ 66} The trial court additionally discredited Monson's testimony because he lacks clinical experience, biomechanical studies have not been performed measuring the effect of impact forces on the brains of live humans, and Monson's experience is laboratory in nature and hospitals do not employ biomechanical engineers. In our view, taking Monson's testimony at face-value leads to the conclusion that an intensely forceful event occurred in Marianne's bedroom, which is consistent with the opinions of Drs. Stevenson, Makaroff, Gray, and Shapiro and contrary to the opinions of Dr. Rothfeder.

{¶ 67} To be sure, we recognize that there are those, including Jones' post-

conviction experts, who reject the diagnosis of abusive head trauma. Our research, and the evidence in this case, supports a belief that acceptance of the diagnosis is by far the prevailing view. *See*, *e.g.*, Sandeep Narang, M.D., J.D., *A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome*, 11 Hous. J. Health L. & Pol'y 505-633 (2011). Criticism is often fostered by the legal defense community adopting the minority medical opinion. *See*, *e.g.*, Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 Wash. U. L.Rev. 1, 27 (2009). Some courts have also joined the fray by doing their own literature analysis to support a conclusion for one side or the other. *See*, *e.g.*, *Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) (citing biomechanical and other studies raising doubt about shaken baby syndrome, most particularly whether it can be caused by shaking alone). But our function and duty is not to weigh in or vote for one side or the other, let alone solve any disagreement of some in the medical community. Nor is it our position to substitute how we might have ruled on the petition if we had considered it in the first instance. Our review is to determine whether the trial court abused its discretion in its ruling.

{¶ 68} Having painstakingly reviewed the record, we conclude that the trial court's credibility analysis was not unreasonable and did not in itself constitute an abuse of discretion. We also determine that the trial court did not abuse its discretion when it concluded that the post-conviction evidence, in the context of the entire record, would not support a reasonable probability of a different result. Finally, Jones' post-conviction evidence is not sufficient to undermine our confidence in the outcome of his trial.

**IV. Conclusion**

{¶ 69} Based on the reasoning set forth above, we overrule Jones' assignment of error and affirm the judgment of the Miami County Common Pleas Court.

. . . . . . . . . . . . .

TUCKER, J., concurs.

FROELICH, J., dissenting;

{¶ 70} I would hold that the trial court acted unreasonably in finding that there is not a reasonable probability that, had the defense called experts, the result would have been different. This does not mean that the Appellant probably would have been found not guilty with "evidence to support his story," only that it is not unreasonable to so conclude.

{¶ 71} Marianne slept in the same room as her mother and Appellant and the injury happened during a "window" when the child was not connected to any medical support equipment. (T-1, 202) Although the prosecutor speculated in closing that there were incidents that might have angered the Appellant and caused him to momentarily "step too far over that cliff" (T-3, 9), there was no testimony or evidence that the Appellant had ever been abusive to Marianne or anyone prior to the day of the injury; nor was there any evidence that he had a quick temper or was prone to fits of anger or was anxious, overwhelmed, or upset on the day of the injury.

{¶ 72} The State argued that motive is not an element and that Appellant's testimony that "I don't know what happened to her," "just doesn't cut it in the face of the medical evidence that we have in this case." (T-3, 4). "If he asks you to believe something, which he did, there has to be evidence to support it. And the medical evidence does not

support his story" (emphasis added) ( T-3, 11). "No matter what defense counsel tells you, use your collective memory; no doctor or any other witness ever said there is an old injury that's related to the injury she suffered on August 5, 2010 …" (T-3, 11); the evidence, the prosecutor argued, "doesn't support" any of those "theoretical possibilities" suggested by defense counsel. "It defies medical evidence that it- this injury could have been caused by a non-event, which is what the Defendant would have you believe" (T-3, 31), but rather it had to be "shaking her or hitting her against a soft surface." (T-3, 37).

**{¶ 73}** The State's arguments were based on the only evidence the jury heard; and the jury's verdict was, as we held on direct appeal, not against the manifest weight of the evidence. The State concluded that "… you can follow the medical evidence and the expert testimony and the vast experience on this particular topic, or you can follow what the Defendant said…" (T-3, 30). In other words, in the absence of any medical explanation to the contrary, the jury should believe the unrebutted scientific, medical testimony the State produced and not the denial of a person with no "evidence to support it" and with an obvious reason not to tell the truth. As in *Ceasor v. Ocwieja,* 655 Fed.Appx. 263 (6th Cir. 2016), "The expert is the case." (Emphasis in original and internal citations omitted.) [6]

**{¶ 74}** The trial court's wholesale rejection of Monson's bio-mechanical-based testimony and its total discounting of Rothfeder's testimony, based on his different

---

[6] In *Ceasor,* a federal habeas corpus case, the state court had denied an appeal of an ineffective assistance of counsel claim without holding a hearing where the defendant could introduce his own experts' testimony on what they would have said at trial. Here, the trial court held the hearing and, as stated above, found there was no reasonable probability of a different result. In neither case did the defense call any experts and the convictions were dependent on the State's experts alone.

professional experiences than the State's physicians, deprived Appellant of the right to have the jury make such credibility decisions.[7] I appreciate that in a PCR hearing, the court may sometimes make such judgments. However, in this entirely circumstantial case without any other inferentially-supportive evidence of the Defendant's actions, and where competent evidence exists that is not a "theoretical possibility," confidence in the fairness of the proceeding and the outcome of the case is undermined.

Copies mailed to:

Janna Parker
Nikki Baszynski
Hon. Christopher Gee

---

[7] *See, e.g.,* Poulin, *Tests for Harm in Criminal Cases: A Fix for Blurred Lines*, 17 U. Pa. J. Const. L. 991 (2015), at 1059, discussing the differences between how judges and jurors react to certain evidence.